**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

✓ __ FILED    ___ ENTERED
____ LOGGED    _____ RECEIVED

**2:14 pm, Mar 19 2024**

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____MTD_____Deputy

**IN THE MATTER OF THE SEARCH OF:**

**INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 240-302-4896 AND 240-920-7746, STORED AT PREMISES CONTROLLED BY AT&T**

**Case No.**    8:24-mj-00541-TJS

**INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 240-713-8285, STORED AT PREMISES CONTROLLED BY T-MOBILE**

**Case No.**    8:24-mj-00542-TJS

**UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF
APPLICATIONS FOR SEARCH WARRANTS**

I, Jacqueline Abadir, Special Agent for the Drug Enforcement Administration, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for information associated with cellular devices  assigned call numbers 240-302-4896 (the "**Victim's Number**") and 240-920-7746 ("**Fidel's Number**"), that are stored at premises controlled by AT&T, a wireless telephone service provider headquartered at 11760 US Highway 1, Suite 300, North Palm Beach, Florida 33408.  The information to be searched is described in the following paragraphs and in Attachment A1.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B1.  Upon receipt of the

information described in Section I of Attachment B1, government-authorized persons will review the information to locate items described in Section II of Attachment B1.

2.      I additionally submit this affidavit in support of an application for a search warrant for information associated with a cellular device assigned call number 240-713-8285 ("**Fidel's Number**"), which is stored at a premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.   The information to be searched is described in the following paragraphs and Attachment A2.   This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B2.   Upon receipt of the information described in Section I of Attachment B2, government-authorized persons will review the information to locate items described in Section II of Attachment B2.

3.      I have been a DEA Special Agent since July 2017 and am currently assigned to the Greenbelt High Intensity Drug Trafficking Area office out of the DEA Washington District Office. In this capacity, I investigate drug trafficking organizations operating throughout the Washington Metropolitan area. Prior to becoming a DEA Special Agent, I was a DEA Intelligence Analyst beginning in April 2009.

4.      I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and make arrests for, offenses enumerated in 18 U.S.C. § 2515.

5.      As a DEA Special Agent and a DEA Intelligence Analyst, I have received extensive training in the enforcement of drug laws of the United States, as well as extensive training in criminal investigations.  I also have participated in investigations involving unlawful

narcotics distribution.  As part of these investigations, I have been involved in the application for and execution of arrest and search warrants for narcotics-related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity.  As a narcotics investigator, I have interviewed individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances.  Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers of controlled dangerous substances.  Since 2008, I have supported and participated in narcotics investigations of violators and have assisted in investigations, which have led to the arrests and convictions of members belonging to drug trafficking organizations.  I have experience in investigating drug traffickers, who have distributed controlled dangerous substances leading to serious bodily injury and death of a victim.

6.      I have training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of other investigative tools available to law enforcement officers.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques, among others: interviewing sources of information and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of

both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, and other contraband.

7.      Based on my training, experience, knowledge, and participation in narcotics investigations, I know that it is common for individuals who deal in illegal controlled substances to maintain possession of their cellular telephones when engaging in illegal activity and to communicate with their sources of supply, subordinates, and drug customers.  Furthermore, I know that it is common for individuals who utilize cellular telephones in furtherance of their drug trafficking activities, to maintain on their cellular telephones electronically stored data related to the activity, such as, contact lists, names, phone numbers, text messages, photographs, videos, notes, emails, and documents.

8.      In my training and experience, I have become familiar with the use of cellular telephones by narcotics traffickers to communicate, the patterns of activity of narcotics traffickers, the types and amounts of profits typically made by narcotics traffickers, and the methods, language, and terms used to disguise the source and nature of the profits obtained from narcotics trafficking.  In addition, from my training and experience, I have learned that it is common for narcotics traffickers: (1) to "front" (i.e., provide on consignment) controlled substances to their customers; (2) to conceal contraband, proceeds of narcotics sales, and records of narcotics transactions in secure locations within their residences, vehicles and/or their businesses for ready access; (3) to conceal proceeds from law enforcement authorities and rival narcotics traffickers; and (4) to routinely use digital display cellular telephones and text messaging to facilitate their drug distribution operations.

4

9.      I have also learned that narcotics-trafficking is an ongoing process, requiring the development, use, and protection of a communication network to facilitate daily narcotics distribution, and as such, narcotics traffickers commonly use coded language when speaking with other narcotics traffickers, use multiple cellular telephones, and frequently change their cellular telephone numbers in order to thwart detection by law enforcement agents who may be intercepting or attempting to intercept their communications.  As a result of my training, experience, and knowledge, I have been recognized as an expert in drug trafficking and the use of "coded" language utilized by drug traffickers in the United States District Court for the District of Maryland.

10.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 (a)(1) and (b)(1)(C) (distribution of controlled substances with serious bodily injury and death resulting) have been committed by Franklin CARBAJAL GUERRA, and there is probable cause to search the information described in Attachments A1 and A2 either for evidence of these crimes or exculpatory information relevant to CARBAJAL GUERRA's defense as further described in Attachments B1 and B2.

## PROBABLE CAUSE AND BACKGROUND OF INVESTIGATION

12.      On December 2, 2022, at approximately 7:01 am, a Prince George's Police Department (PGPD) officer responded to a 911 call for service at 4803 Glenoak Road, Hyattsville, MD 20784; "the victim's residence," to assist Prince George's County Fire and

Rescue ("Fire/Rescue") personnel. Upon arrival, the PGPD officer was advised by Fire/Rescue that when they arrived at the victim's residence, they observed 15-year-old Yessina Morales Yaque was unconscious and not breathing. Fire/Rescue personnel conducted CPR. Yessina Morales Yaque was pronounced dead at 7:13 am. Yessina's body was transported to the Office of the Chief Medical Examiner for an autopsy.

13.    While at the victim's residence, PGPD officers spoke to Maria Morales Yaque, Yessina's mother, who stated that she last saw Yessina alive on December 1, 2022 at approximately 11:00 pm. Maria advised that when she woke up to go to work on December 2, 2022 at approximately 5:00 am, she did not notice Yessina in their bedroom and went to try to use the bathroom.[1] At this time, Maria advised she waited approximately fifteen minutes and attempted to call Yessina with a negative response. Maria then opened the bathroom door and observed Yessina face down on the floor.  At this time, Maria dragged Yessina into her bedroom, where she laid Yessina down on the bed. After approximately an hour later, Maria observed that Yessina was still unresponsive and called 911.

14.    Fire/Rescue personnel located two blue pill pieces, one half- and one quarter-pill, in a small glassine baggie located on the bathroom sink. The pill was submitted to the PG County Drug Analysis Laboratory for analysis. The laboratory report concluded that the 1 half and 1 quarter pill pieces contained fentanyl, a schedule II controlled dangerous substance. Additional PGPD officers responded to the victim's residence. PGPD officers located Yessina's iPhone, phone number 240-302-4896, the **Victim's Number**. Maria confirmed that the iPhone was in

---

[1] Maria Morales Yaque and Yessina shared a bedroom and a bathroom.

fact Yessina's. The iPhone was seized by PGPD officers. The contents of the iPhone were later extracted.

15.     On December 3, 2022, Assistant Medical Examiner Dr. Avneesh Gupta performed an autopsy on Yessina's body. Dr. Gupta concluded Yessina's death was caused by fentanyl intoxication.

16.     Investigators located an Instagram text message chain with "mr.blue_30" on Yessina's iPhone. On December 1, 2022, starting at approximately 7:58 pm, Yessina sent the following texts to Instagram user "mr.blue_30" from **Victim's Number**: [2]

> Yessina: "hello how much a pop?"
> Yessina: "oh okay"
> Yessina: "are you in wheel?
> Yessina: "yess"
> Yessina: "I have 20"
> Yessina: "6908 Buchanan St, Hyattsvilel, MD 20764"[3]
> Yessina: "Oh okay bett"
> Yessina: "oh okay"
> Yessina: "Coming"
> Yessina: "Is that you with th elights on?"
> Yessina: "I'm in front of you"
> Yessina: "Thanks you so much"

17.     On June 16, 2023, United States Magistrate Judge Timothy J. Sullivan signed a search and seizure warrant for information associated with mr.blue_30's Instagram account for the time period of November 30, 2022 to December 3, 2022. The Instagram return information listed the phone number associated with "mr.blue_30" as 240-643-0483. A query of law enforcement records associated 240-643-0483 with Franklin CARBAJAL GUERRA.

---

[2] There was no other time stamp during Yessina's Instagram conversation with "mr.blue_30.". Investigators only observed Yessina's responses; "mr.blue_30's" responses were not visible.

[3] 6908 Buchanan Street, Hyattsville, MD is approximately three houses away from the victim's residence.

18.     After investigators further reviewed Yessina's phone, investigators found Yessina was in communication with two individuals, Michael Feria and Fidel Joya Sanchez, on the evening of December 1, 2022, both of which conversations continued after the exchanges with mr.blue_30.

19.     On December 1, 2022, at approximately 6:55 pm, Yessina (theyluv.yxsina) received an Instagram text from "dmv.mike", identified as Michael Feria. During the text chain with Yessina, Michael told Yessina that he was going to go out with a friend to "chill" and asked Yessina if she wanted to come as well. Yessina asked who Michael's friend was, Michael responded "Fredy"; Yessina then asked if she could bring a friend. Mike responded that she could bring a friend and stated that "we" can pick Yessina up. Michael asked who Yessina's friend was, Yessina sent Mike a link to "babyjosiexxo", Michael then stated that they would pick Yessina up at around 11:30 pm/12:00 am. Michael texted Yessina to text him at 240-713-8285 (**Michael's Number**). The Instagram conversation between Mike and Yessina ended at approximately 7:49 pm.

20.     On December 1, 2022, at approximately 7:50 pm, Yessina began a text conversation with Michael on **Michael's Number**. Yessina asked Michael if her friend Emily could come as well, though there was no indication about where they planned to go. Michael asked Yessina to send him Yessina's address and Yessina complied. Yessina also stated that her friend lived 5 minutes away. Michael texted Yessina to start getting ready at 11:30 pm. At approximately 11:03 pm, Michael texted Yessina to "Hold up tho cause sun just happen to his car".

21.     On December 1, 2022, at approximately 10:49 pm, Fidel, using **Fidel's Number** FaceTimed Yessina for about 1 minute.

22.     On December 2, 2022, at approximately 12:13 am, Yessina asked Fidel where he was. At 12:15 am, Yessina texted Fidel "Are you still coming". At 12:15 am and 12:17 am, Yessina attempted to call **Fidel's Number**. At approximately 12:18 am, there was an incoming FaceTime call from Fidel for 1 minute. At 12:19 am, Yessina FaceTimed Fidel for 1 minute.

23.     On December 2, 2022, at approximately 12:24 am, Michael texted Yessina that "His car broke down". At 12:45 am, Michael texted Yessina "Wanna come over ?" and one minute later sent another text stating that he would Uber Yessina. At 12:57 am, Yessina asked Michael if he would also cover the Uber back to her residence. There are no additional texts from Michael on Instagram or texts messages.  At approximately 12:59 am, Yessina texted Fidel "How far are you".  There were no additional text messages or calls on Yessina's phone from **Fidel's Number**.

24.     Your affiant interviewed both Michael and Fidel, who each stated that they did not visit or see Yessina on December 1, 2022 or the early morning hours of December 2, 2022. This affidavit seeks historical cell site to confirm that Yessina remained at her residence the evening of December 1, 2022 and December 2, 2022. This affidavit also seeks the requested information to confirm that neither Michael or Fidel met with Yessina on December 1, 2022 or December 2, 2022, after her apparent purchase of the fentanyl from mr.blue_30 and prior to her fentanyl overdose death.

## BACKGROUND CONCERNING AT&T AND T-MOBILE

25.     In my training and experience, I have learned that AT&T and T-Mobile are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone services have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service,

including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

26.     Based on my training and experience, I know that AT&T and T-Mobile can collect cell-site data about the **Victim's Number, Michael's Number, and Fidel's Number**.  I also know that wireless providers such as AT&T and T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

27.     Based on my training and experience, I know that wireless providers such as AT&T and T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as AT&T and T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute

evidence of the crimes under investigation because the information can be used to strengthen the circumstantial evidence that CARBAJAL GUERRA sold the fatal dose of fentanyl to Yessina or, alternatively, provide potentially useful exculpatory information useful to his defense.

## AUTHORIZATION REQUEST

28.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

29.     I further request that the Court direct AT&T and T-Mobile to disclose to the government any information described in Section I of Attachments B1 and B2 that is within the possession, custody, or control of AT&T and T-Mobile.  Because the warrants will be served on AT&T and T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

30.     I further request that the Court order that all papers in support of the applications, including the affidavit and search warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____

Jacqueline Abadir
Special Agent
Drug Enforcement Administration

11

Subscribed and sworn to before me on February  28th , 2024

The Honorable Timothy J. Sullivan
United States Magistrate Judge

## <u>ATTACHMENT A1</u>

### Property to Be Searched

This warrant applies to records and information associated with the following cellular devices assigned call numbers 240-302-4896 (the "**Victim's Number**") and 240-920-7746 ("**Fidel's Number**") that are stored at premises controlled by AT&T, a wireless telephone service provider headquartered at North Palm Beach, Florida.

**ATTACHMENT B1**

**Particular Things to be Seized**

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A1 is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A1 for December 1, 2022 to December 2, 2022:

    a.  The following information about the customers or subscribers of the Account:

        i.  Names (including subscriber names, usernames, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long-distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

14

    b.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

       ii.   information regarding the cell towers and sectors through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. § 841 (a)(1) and (b)(1)(C) (distribution of controlled substances with serious bodily injury and death resulting) involving Franklin CARBAJAL GUERRA and all co-conspirators, known and unknown, between December 1, 2022 and December 2, 2022.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## ATTACHMENT A2

### Property to Be Searched

This warrant applies to records and information associated with the following cellular devices assigned call numbers 240-713-8285  (" **Michael's Number**") that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at Parsippany, New Jersey.

## ATTACHMENT B2

### Particular Things to be Seized

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A2 is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A2 for December 1, 2022 to December 2, 2022:

    a.  The following information about the customers or subscribers of the Account:

        i.  Names (including subscriber names, usernames, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long-distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications)

relating to wire and electronic communications sent or received by the Account,

including:

      i. the date and time of the communication, the method of the
communication, and the source and destination of the communication
(such as the source and destination telephone numbers (call detail
records), email addresses, and IP addresses); and

      ii. information regarding the cell towers and sectors through which the
communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband,

and instrumentalities of violations of 21 U.S.C. § 841 (a)(1) and (b)(1)(C) (distribution of

controlled substances with serious bodily injury and death resulting) involving Franklin

CARBAJAL GUERRA and all co-conspirators, known and unknown, between December 1,

2022 and December 2, 2022.

Law enforcement personnel (who may include, in addition to law enforcement officers

and agents, attorneys for the government, attorney support staff, agency personnel assisting the

government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things

particularly described in this Warrant.

18

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon. The attached records consist of _____.


I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T, and they were made by AT&T as a regular practice; and

      b.     such records were generated by AT&T's electronic process or system that produces an accurate result, to wit:

          1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T in a manner to ensure that they are true duplicates of the original records; and

          2.     the process or system is regularly verified by AT&T, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____.


I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile, and they were made by T-Mobile as a regular practice; and

b.      such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by T-Mobile, and at all times pertinent to the records certified here the process and system functioned properly and normally.

21

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                     Signature